# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

**FILED**

DEC 2 0 2023

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____,DEPUTY

**(1) RASHAWN WILSON, as a (party of one) and,**

**(2) on behalf of INDIVIDUALS WHO ARE SIMILARLY SITUATED,**

        **Plaintiffs,**

        **v.**

**(1) CITY OF LAWTON, OKLAHOMA,**

**(2) JOHN RATLIFF, in his official capacity,**

**(3) TIMOTHY WILSON, in his official capacity,**

**(4) RICHARD FRANZ, in his personal and official capacity,**

**(5) NICHOLAS FLORES, in his personal and official capacity,**

**(6) PATRICK BELLAMY, in his personal and official capacity,**

**(7) BRANDON BRECKER, in his personal and official capacity,**

        **Defendants.**

**Civil No.:** CIV-23-1165-R

**JURY TRIAL DEMANDED**

## PLAINTIFF'S ORIGINAL COMPLAINT

Comes Now the Plaintiff, Rashawn Wilson, who is African American and diagnosed with physical and mental impairments that substantially limits brain functions of thinking, concentration, emotions, mood, behavior, and other major life activities protected under the Americans with Disabilities Act (ADA or Title II), 42 U.S.C. §§ 12131-34; Section 504 of the Rehabilitation Act of 1973 (Section 504 or RA), 29 U.S.C. § 794; and under Okla. Stat. Tit. 25, Sec. §§ 1101-1706 and show the Honorable Court as follows:

## NATURE OF THE ACTION

Plaintiff, Rashawn Wilson, asserts that the City of Lawton (City), under the well-established "Repeated Violations Doctrine", consistently neglected to ensure equal access to its services, programs, and activities, repeatedly failing to provide reasonable accommodations for individuals with disabilities. Plaintiff accuses the City of engaging in a "pattern and practice" of unreasonable conduct that violates the United States Constitution (Constitution) and federal law particularly during police interactions. On December 29, 2022, Plaintiff, due to his diagnosed disabilities, alleges fear and a lack of understanding, preventing him from invoking his Constitutional rights against "unreasonable searches and seizures" (Fourth Amendment) and "self-incrimination" (Fifth Amendment). This alleged failure to protect him as a backseat passenger during his "submission to the assertion of authority" throughout police interactions with experienced officers from the Lawton Police Department (LPD) is characterized as "unconstitutional policing" by Plaintiff. Furthermore, the City is accused of demonstrating a "reckless disregard" for the rights of individuals with disabilities by repeatedly failing to establish regulations implementing Title II of the ADA and Section 504.

The Title II administrative regulations pertain to nondiscrimination on the basis of disability in State and local government services, aiming to facilitate the "effective" and "meaningful" participation of individuals with disabilities in various programs, services, and activities, including "police interactions" such as detainment, detentions, investigations, and arrests. The City's "conscious decision" and alleged failure to implement Title II regulations is deemed as "deliberate indifference" to the needs of individuals with disabilities.

Plaintiff alleges a "knowing" and "willful" failure to reasonably modify City and LPD rules and policies to accommodate individuals with disabilities. Plaintiff, alleges Title II of the ADA provides that "no qualified individual with a disability shall, because of that disability, be excluded from participation in, denied the benefits of, or "subjected to discrimination" in the services, programs, and activities of all state or local government entities, including law enforcement,... Law enforcement street interactions, taking and responding to complaints or calls for assistance, vehicle stops and searches, arrests, detentions, interviews, interrogations, and emergency responses." *See* https://archive.ada.gov/cjta.html#:~:text=Title%20II%20of %20the%20ADA,government%20entities%2C%20including%20law%20enforcement%2C

The City and its departments are public entities liable under 42 U.S.C. §§ 1983 & 1988, Fourteenth Amendment, Tenth Circuit's "Repeated Violations Doctrine", Title II, Section 504, as well as Oklahoma Statute Title 25, Section 1101-1706.

## THE PARTIES

1.          Plaintiff, Rashawn Wilson (Plaintiff or Mr. Wilson), is a resident of Comanche County in the State of Oklahoma within the Western District of Oklahoma, brings forth this legal action seeking redress for the infringement of his rights as a back-seat passenger with

disabilities during a traffic stop. This lawsuit arises from his unconstitutional detainment by LPD officers acting under the color or law, extended unreasonably through standardized field sobriety testing (SFST) and an unjustified vehicle search conducted during a late-night roadside investigation while depriving Plaintiff of his federal rights under Title II of the ADA.

2.      The Defendant, City of Lawton (City), constitutes a political subdivision of the State of Oklahoma, with its City Hall situated in Lawton, Oklahoma, within the jurisdiction of the Western District of Oklahoma. As a municipal entity, the City of Lawton holds a pivotal role in the alleged constitutional violations and systemic failures addressed in this legal action. It is crucial in upholding constitutional standards and delivering essential services, making the City's unwritten policy and the City's inaction it central to the injuries raised in this lawsuit.

3.      Upon information and belief, JOHN RATLIFF was the City Attorney but now is currently the City Manager of the City and is sued in his official capacity. Mr. RATLIFF is a resident of Comanche County which is located within the Western District of Oklahoma. During all relevant times described herein he was acting under color of law.

4.      Upon information and belief, TIMOTHY WILSON was the interim City Attorney but now is the official City Attorney of the Legal Services Department of the City and is sued in his official capacity. Mr. WILSON is a resident of Comanche County which is located within the Western District of Oklahoma. During all relevant times described herein he was acting under color of law.

5.      Upon information and belief, RICHARD FRANZ is the Deputy Directed of Emergency Communications and is sued in his personal and official capacity. Mr. FRANZ is a resident of Comanche County which is located within the Western District of Oklahoma. During all relevant times described herein he was acting under color of law.

6.      Upon information and belief, NICHOLAS FLORES is a uniformed officer hired by the Lawton Police Department and is sued in his personal and official capacity. Officer FLORES is a resident of Comanche County which is located within the Western District of Oklahoma. During all relevant times described herein he was acting under color of law.

7.      Upon information and belief, PATRICK BELLAMY is a sergeant/detective hired by the Lawton Police Department and is sued in his personal and official capacity. Officer BELLAMY is a resident of Comanche County which is located within the Western District of Oklahoma. During all relevant times described herein he was acting under color of law.

8.      Upon information and belief, BRANDON BECKER is a uniformed officer hired by the Lawton Police Department and is sued in his personal and official capacity. Officer BECKER is a resident of Comanche County which is located within the Western District of Oklahoma. During all relevant times described herein he was acting under color of law.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and 1343 because the claims alleged arise under the Constitution and laws of the United States of America and pursuant to 42 U.S.C. § 1983. The Court also has original jurisdiction of the claims arising under the Americans with Disabilities Act of 1990, the Americans with Disabilities Amendments Act of 2008, codified pursuant to 42 U.S.C. § 12101 and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

10.     This Court has supplemental jurisdiction over the state claims alleged herein pursuant to 28 U.S.C. § 1367(a).

11.     This Court has personal jurisdiction over all the defendants because they are either political subdivisions of the State of Oklahoma or citizens of the State of Oklahoma.

12.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) in that the defendants reside in the Western District of Oklahoma and a substantial part of the events giving rise to the claim occurred in the Western District of Oklahoma.

## FACTUAL ALLEGATIONS[1]

13.       Plaintiff, Rashawn Wilson, is diagnosed with Post-Traumatic Stress Disorder

(PTSD), Attention-Deficit / Hyperactivity Disorder (ADHD) that affects his major bodily

function such as his neurological system that includes, but not limited to: physical or mental

impairments, emotional disorders, and brain functions limiting the ability to think, concentrate,

control emotions, moods, impulsive behaviors, and other major life activities. The PTSD,

ADHD, with anxiety and depression diagnosis affects Plaintiff's major life activities that

include, but are not limited to: performing manual tasks, sleeping, learning, reading,

concentrating, communicating, thinking, working, and interacting with others.


14.       Plaintiff is an "impacted person" with a disability who has been discriminated

against, and continues to be discriminated against, by the lack of implementation of

administrative requirements under Title II of the ADA and Section 504 by City Policymakers.


15.       Plaintiff's father, Andre Wilson (Mr. A. Wilson), is an "impacted person" and

disability advocate with the Poor People's Campaign: A National Call for Moral Revival,

https://www.poorpeoplescampaign.org/, also diagnosed with mental and physical disabilities

---

[1] The events underlying this lawsuit were largely captured by body-worn cameras (BWC) on
each officer involved. The BWC footage was obtained from the City of Lawton via Oklahoma
Open-Records Act (ORA) request. For the Court's convenience, footage from the cameras is
available at the following links:
- Officer FLORES BWC video (FLO CAM): https://youtu.be/pzEA2uz1u2Q
- Officer BELLAMY BWC video (BEL CAM): https://youtu.be/Q8RkqWLSDos
- Officer BECKER BWC video (BEC CAM): https://youtu.be/QtICHnVt-qU

protected under the Americans with Disabilities Act (ADA or Title II), 42 U.S.C. §§ 12131-34, and Section 504 of the Rehabilitation Act of 1973 (Section 504 or RA), 29 U.S.C. § 794.

16.     Plaintiff's Step-mother, Itai Chinhamo-Wilson (Mrs. Wilson), wass a Vocational Rehabilitation Specialist IV and disability advocate employed by the Oklahoma Department of Rehabilitation Services (OKDRS) on 1802 NW Ferris Avenue Lawton, Oklahoma 73507.

17.     Plaintiff and his parents, Mr. and Mrs. Wilson, allege that the City and LPD have received "active and constructive" notice that they are public entities under Title II of the Americans with Disabilities Act (ADA). Additionally, Plaintiff's parents have personally spoken with the City Policymakers and Top-brass of the Lawton Police Department (LPD) during scheduled meetings as well as City Councilpersons at City Hall to inform them of their lack of compliance with Title II of the ADA as they can be held liable under 42 U.S.C. § 1983- Civil action for deprivation of rights.

18.     Plaintiff and his parents, assert that the City Policymakers, Department Heads, and police officers "knew or should have known" that their actions would violate federal laws and constitutional rights under Title II of the ADA because of their "failure to train" all City of Lawton (City) supervisors and employees, including police officers for "lawful and effective" interactions, such as, "wrongful arrest" and "failure to make a reasonable accommodations" during arrest, including other 'police interactions' such as 'traffic stops' and investigatory detainment.  See *Gohier v. Enright* (10th Cir. 1999); *Sudac v. Hoag*, (D. Kan. 2005)

19.     Plaintiff and his parents proclaim that the United States Congress (Congress) intended for the ADA to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." (Pub. L. 101–336, §2, July 26, 1990, 104 Stat. 328; Pub. L. 110–325, §3, Sept. 25, 2008, 122 Stat. 3554.) https://www.govinfo.gov/content/pkg/USCODE-2009-title42/html/USCODE-2009-title42-chap126.htm (42 U.S.C. 2009 Edition)

20.     Additionally, under §12132. Discrimination - Subject to the provisions of this sub-chapter, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be 'subjected to discrimination' by any such entity." (Pub. L. 101–336, title II, §202, July 26, 1990, 104 Stat. 337.)

21.     Plaintiff declares that the ADA affects virtually everything that [officers] and deputies do, for example: "receiving citizen complaints; interrogating witnesses; arresting, booking, and holding suspects; operating telephone (911) emergency centers; providing emergency medical services; enforcing laws; and other duties." https://www.ada.gov/resources/commonly-asked-questions-law-enforcement/#introduction

22.     Plaintiff notes that Title II of the ADA "requires law enforcement agencies to make reasonable modifications in their policies, practices, and procedures that are necessary to ensure accessibility for individuals with disabilities."

https://www.ada.gov/resources/commonly-asked-questions-law-enforcement/#modifications-of-policies-practices-and-procedures

23.    As the court noted in *Schorr v. Borough of Lemoyne*, "nothing in the statute, regulations, or legislative history suggests any exceptions to the Act [ADA] for certain police activities."

24.    Likewise, 1) Plaintiff professes that he is a qualified individual with disabilities; 2) Plaintiff declares he was denied "fair and equal treatment" by being discriminated against because of hiss disabilities by the City's police department [public entity] and officers who provide services, programs, or activities to the public; 3) Plaintiff states that he was "denied reasonable accommodations" and "discriminated against by the reason of his disability" and that such exclusion of fair and equal treatment through the lack of establishing administrative requirements via Title II of the ADA assisted with the denial of his fundamental rights to "reasonable accommodations" and other administrative requirements under Title II of the ADA.

25.    Plaintiff contends that the City Policymakers and LPD's leadership, including Chief of Police James T. Smith, "knew or should have known" of Plaintiff's disabilities following multiple interactions with Plaintiff and his parents from 2010 to the present. Despite this awareness, Title II, which covers "all programs, services, and regulatory activities relating to law enforcement" (28 C.F.R. § 35.190(b)(6)), has not been implemented by the City.

26. Congress charged the Department of Justice (Department or DOJ) with implementing Title II of the ADA by promulgating regulations, issuing technical assistance, and bringing suits in federal court to enforce the statute. 42 U.S.C. §§ 12133-12134, 12206.

27. Plaintiff proclaims the Department implements Title II as to "[a]ll programs, services, and regulatory activities relating to law enforcement." 28 C.F.R. § 35.190(b)(6). The United States therefore may have a strong interest in the "proper interpretation of Title II" in the context of law enforcement activities, including detainment, detention, investigations, and arrests of individuals with disabilities as passengers during a traffic stop.

28. Plaintiff has a special interest in how LPD treat all people with disabilities, including minors, during on-the-street encounters and police interactions to prevent and protect their Constitutional Rights, such as in this case during the course of detainment, detentions, investigations, and arrests.

29. Plaintiff relies on legal definitions from the Legal Information Institute (LII): **Detain** v. *[with object]* **and Detention** n.— In criminal law, to detain an individual is to hold them in custody, normally for a temporary period of time. Police in the United States, under Supreme Court precedent in Terry v. Ohio, may temporarily detain an individual if there is reasonable suspicion that the individual is *armed*, *engaged in*, or *about to be engaged in criminal conduct*. In the motor vehicle context, a police officer may detain a vehicle pending

inquiry into a vehicular violation regardless of whether criminal activity is suspected. There is no bright light line between a detention and an arrest—courts will often look to a variety of factors in determining whether either has occurred during an interaction with police. While reasonable suspicion is required for detention of an individual by law enforcement, probable cause is a prerequisite for an arrest; (https://www.law.cornell.edu/wex/detain).


30.     **Arrested** v. *[with object]and* **Arrest** n.— An arrest is the use of legal authority to deprive a person of their freedom of movement.

An arrest is generally made with an arrest warrant. An arrest may be made without a warrant if probable cause and exigent circumstances are presented at the time of the arrest.

Probable cause is a reasonable belief of the police officer in the guilt of the suspect, based on the facts and information prior to the arrest. For instance, a warrantless arrest may be legitimate in situations where the police officer has a reasonable belief that the suspect has either committed a crime or is about to commit a crime. The police officer might also arrest the suspect to prevent the suspect's escape or to preserve evidence. However, a warrantless arrest may be invalidated if the police officer failed to demonstrate exigent circumstances and probable cause. The right to make warrantless arrests are commonly defined and limited by statutes subject to the due process guaranty of the U.S. Constitution. The suspect arrested without a warrant is entitled to prompt judicial determination generally made in 48 hours.

An arrest may trigger certain procedural requirements; for instance, the person under arrest must be given a Miranda Warning.

See, e.g. *Maryland v. Shatzer*, 130 S.Ct. 1213 (2010);(https://www.law.cornell.edu/wex/arrest)

31.     The Fourth Amendment requires that, in order for an officer to justify an investigatory stop, the officer must have "specific and 'articulable facts' sufficient to give rise to 'reasonable suspicion' that a person has committed or is committing a crime." *United States v. Cooper*, 733 F.2d 1360, 1363 (10th Cir. 1984) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)); *see also United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996).

32.     That standard, while not particularly challenging to meet, is not toothless. Reasonable suspicion demands "something more than an 'inchoate and unparticularized' suspicion or 'hunch.'" *Davis*, 94 F.3d at 1468 (quoting *United States v. Melendez-Garcia*, 28 F.3d 1046, 1051 (10th Cir. 1994)). For a traffic stop to be lawful, it is not enough that officers suspect that an individual is a criminal in the abstract. Rather, the officers must have a "specific factual basis for suspecting that a particular crime was being committed by [an individual] at the time he was detained." *Id.* at 1470; *see also United States v. LeosQuijada*, 107 F.3d 786, 792 (10th Cir. 1997) ("[T]he detaining officers must have, based on all the circumstances, 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'") (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).

33.     In Officer NICHOLAS FLORES'S (Officer FLORES) 1:01:57 redacted FLO

CAM footage from December 29, 2022, acquired through an ORA request by Plaintiff's father,

Mr. A. Wilson, depicts Officer FLORES observing a car with a malfunctioning headlight

traveling westbound on Gore Blvd. by Mr. ANDRE ROBLES (MR. ROBLES), a friend of

Plaintiff who is an African-American.


34.     Officer FLORES traveling east on Gore Blvd. made a u-turn at the traffic light

located at 38th Street, FLO CAM at 1:33, as he switch on his sires and flashing red and blue bar

lights, FLO CAM at 2:00, to performed a traffic stop of a motor vehicle.


35.     Mr. ROBLES parked his vehicle near the corner of 49th Street and Gore Blvd.,

accompanied by three other passengers who, "submitted to the officers' authority," as their

"freedom of movement" was restrained by Officer FLORES throughout the duration of their

detainment, detention, investigations, and arrest.


36.     Plaintiff perceived himself as being "seized" and deprived of the freedom of

movement by Officers FLORES'S "show of authority", as Plaintiff assessed the circumstances

of the encounter, See *Brendlin v. California*. Taking into account the nature of Officer

FLORES'S remarks, the manner of questioning, the ages of the teenagers, and Plaintiff's

diagnosed disabilities, including ADHD, PTSD with suicidal ideations, anxiety, and depression,

a reasonable person in his position would logically determine that they were not free to leave.

37.     Plaintiff asserts that, prior to instructing all the teens to exit the vehicle for detainment, detention, investigation, and arrest on the curb, Officer FLORES employed a deliberate "police strategy".

38.     Plaintiff alleges that Defendant Officer FLORES openly acknowledged, during the stop, that "this isn't my first rodeo," strategically leading the driver to admit to smoking marijuana earlier in the night. As a result, Officer FLORES employed a coercive strategy, articulating his "subjective opinion" and alleging the presence of a strong odor of "freshly smoked marijuana" inside the car in his attempt to fabricate probable cause (PC) for a vehicle search. This maneuver amounted to a "fishing expedition" in the winter cold weather, ultimately seeking to bypass the unknowing teens' constitutional rights during the detainment, detention, investigation, and arrest.

## A.     The LPD is Violating the Fourth Amendment Because It Instructs Officers to Unconstitutionally Extend Traffic Stops Without Reasonable Suspicion.

39.     Even if a traffic stop is lawfully initiated, the Fourth Amendment continues to restrict the scope of the encounter. "An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). "Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.*

40.     As a result, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' ... and to attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015); *see also Illinois v. Caballes*, 543 U.S. 405, 407 (2005). To "detain the driver and conduct further questioning" during a traffic stop, an officer must "acquire an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity." *United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir. 1997) (quoting *United States v. Sandoval*, 29 F.3d 537, 540 (10th Cir. 1994)).

41.     The Fourth Amendment demands reasonable suspicion that an individual is committing a "particular crime" "at the time he was detained." *U.S. v. Davis*, 94 F.3d at 1470.

> **B.     The LPD's Policy and Practice (or Lack Thereof) Repeatedly Violates The Fourth Amendment Because It Fails to Apply to On-the-Street Police Encounters and Disregards The Constitutional Rights Of Individuals With Disabilities**

42.     Defendants misconstrue their obligation under Title II to make reasonable modifications to their police policies, practices, and procedures that should apply during an arrest when necessary to avoid disability discrimination, suggesting that Mr. Wilson did not make it known that he had a disability nor —despite his age, the context of the officer's aggressive behavior and verbal assertions that he is a competent and experienced law-enforcement officer, and Plaintiff failing to make known disabilities that should have been documented by LPD—was required to request a reasonable modification during the course of his detainment, detention, investigation, and arrest is per se unreasonable.

43.     Plaintiff and his parents assert that the City unreasonably denies police records requests under the Oklahoma Open Records Act (ORA) by assessing burdensome fees under the City's February 9, 2023, "Open Records Request Response Policy, Article A-1-2A Miscellaneous."; 'Computer aided search' assessed by Computers Services Supervisor based on machine time, labor and materials, and copy cost; "Call for service research fee" $7.00 per half hour; "Copies of audio recordings on disc" $25.00; "Video Footage" $34.50 per camera source (body camera, vehicle); "Police Archived Reports" Pull Fee $11.50 plus cost of report, and are reluctant to provide public information when conducting discovery requests associated with LPD's Standard of Operation Procedures (SOP) when providing activities, services, and programs to individuals with disabilities, internal affairs information, and the policies that are important and relevant to "social importance of the general public" in liability cases where significant "public policy interests" would be furthered, See *Fourhorn v. City & Cnty. of Denver*, No. 08-cv-01693-MSK-KLM, 2009 U.S. Dist. LEXIS 71042, at *13-14 (D.Colo. Aug. 3, 2009) ("[G]iven the apparent frequency with which mistaken-identity arrests occurred and the alleged collateral harm caused by the arrests, the issue is one of great importance in assuring the public that innocent citizens are not being unlawfully and unnecessarily detained by police. While disclosure of the internal affairs documents at issue may marginally contribute to timidity in future handling of investigations, disclosure may also have the opposite effect here. Specifically, it may caution City officials to take similar issues seriously and to conduct investigations and adopt policies calculated to correct and minimize future mistakes.").

44.     Plaintiff claims that City Policymakers and Departmental Head Chief of Police, James Smith "knew or should have known" about the lack of Title II administrative regulations in police interactions that have led to ongoing constitutional violations corroborated by Policymakers, City supervisors, and employees. Plaintiff asserting municipal liability under *Monell* is entitled "not only to factual information concerning [a governmental actor's] alleged past violations, but also to information concerning his superiors' knowledge of those violations and what, if anything, they did about them.", *See Everitt v. Brezzel,* 750 F. Supp. 1063, 1069 (D. Colo. 1990).

45.     Plaintiff have a interest in and proclaim that documents that contain information regarding statistical studies and comparative data of the discipline (or lack thereof) of municipal employees "are directly related to establishing notice and deliberate indifference." *See Graber v. City & Cnty. of Denver*, No 09-cv-01029-JLK-MJW, 2011 U.S. Dist. LEXIS 82226, at *11 (D. Colo. July 27, 2011).

46.     In the same vein, documents relating to independent investigations are relevant to key issues, such as whether "policymaking officials had notice of the alleged 'widespread practice' and acted with deliberate indifference, or tacit approval, towards the previously alleged violations" by a governmental entity, and are also discoverable. *Id.* at *10-11.

47.     Additionally, as far as Plaintiff's requests for Defendant's disciplinary records, document requests under Federal Rule of Civil Procedure 34 should be "specifically tailored to

adduce statistical evidence relevant to . . . [the alleged] custom of unconstitutional misconduct." *Id.* at *9 (holding that a request for a police officer's performance reviews and all of the Denver Police Department officers' disciplinary records was "reasonably calculated to lead to the discovery of admissible evidence" (quoting FED. R. CIV. P. 26(b)(1))).

48.      Plaintiff says that District courts in the Tenth Circuit have repeatedly found that evidence of similar citizen incidents can be strong evidence in the prosecution of a municipal liability claim. *See, e.g., Schlenker v. City of Arvada*, No. 09-cv-01189-WDM-KLM, 2010 U.S. Dist. LEXIS 84963, at *4-5 (D. Colo. July 19, 2010) ("Documents and information regarding similar citizen complaints are clearly relevant to the conduct at issue here, particularly to Plaintiff's municipal liability claim. . . . Further, because the definition of relevance is broadly construed for purposes of seeking discovery, Defendant Arvada's position that the discovery sought had to be more closely 'linked' to the conduct at issue here, rather than merely similar, was likewise an unreasonable position."). In *Mason v. Stock,* 869 F. Supp. 828 (D. Kan. 1994), the court permitted the discovery of evidence into internal affairs files, disciplinary investigations, and actions. *Id.* at 835.

49.      Furthermore relevant to claims mentioned here, the plaintiff, who had brought a § 1983 claim against a municipal defendant, sought information related to citizen complaints of police misconduct, including "all investigatory files and case files related to those complaints." *Id.* 830. In finding that the plaintiff was entitled to discover this information, the court stated that it was "simply giving plaintiff a full and fair opportunity to come up with evidence that

substantiates his 'pattern and practice' claims." *Id.* 835. The Colorado Supreme Court has

likewise held that this type of evidence is relevant to issues regarding the training and

supervision of police officers. *See Martinelli v. Dist. Ct.*, 612 P.2d 1083, 1087 (Colo. 1980).

The court also stated: [I]nformation relating to: [citizens' complaints] against individual police

officers; records of actions taken in response to citizen complaints; and reports on the officers'

handling of many different situations . . .

. . . could be probative of the department's knowledge of specific instances of misconduct on

the part of the individual police officers, or their propensities toward such misconduct, if any.

The information could also be probative of the department's efforts to supervise the officers

and to minimize the occurrence of such misconduct, and of the department's reasons for

retaining individual police officers after the resolution by the Staff Investigation Bureau of

citizen complaints against the officers.


50.    Plaintiff alleges Policymakers had actual knowledge of City employees, including

officers from LPD violating the rights of Plaintiff while simultaneously Policymakers along

with department heads acquiesced in the violations by fostering an inadequate unwritten ADA

Policy.


51.    Plaintiff alleges the City Policymakers breached their duty to provide individuals

with disabilities reasonable accommodations/modifications to City's programs, services, or

activities under Title II and Section 504.

52.     Further, Plaintiff claims Policymakers had actual and constructive notice that the City actions or inactions to adopt Title II administrative regulations under the ADA would certainly result in constitutional violations of individuals with disabilities.

53.     What's more, the City Policymakers consciously or deliberately choose to disregard the risk of harm by failing to train, supervise, educate, and adopt federal Title II administrative regulations under the ADA after timely complaints and notifications by "impacted people" with disabilities.

54.     Additionally, Plaintiff alleges with deliberate indifference to the consequences, Policymakers officials actions and inactions helped to establish and maintain a policy, practice, or custom which directly caused the violation, harm, and injury to Plaintiff.

55.     Plaintiff assets that "in practice" the City arbitrarily engages in an official unwritten "failure to protect" policy that discriminates against people with disabilities.

56.     Plaintiff alleges that the City's current services, programs, and activities are not "readily available and accessible" to individuals with mental and physical disabilities including, but not limited to, cognitive impairments and mood disorders.

57.     Plaintiff claims that the City have been provided Title II training materials from the DOJ to safeguard the rights of people with disabilities and mitigate municipal liability.

58.     Plaintiff affirms that there is a "pattern of constitutional injuries" traceable to the

City's challenged "ADA policy" or custom. The City's unconstitutional written "ADA policy",

City Code 13-1-101, was presented to the Plaintiff's father in an email approximately July 2021

from the former City Manager, Michael Cleghorn.


59.     Plaintiff argues that under the Fourteenth Amendment of the Constitution,

Policymakers have an "affirmative duty" to govern minorities and individuals with disabilities

impartially when it chooses to accept federal financial assistance from the United States.


60.     Plaintiff alleges that a "good faith" intent to adopt and utilize Title II

administrative regulations have not been established by the City Policymakers in violation of

the ADA and Section 504. In addition, City Policymakers inations to adopt Title II

administrative regulations for individuals with disabilities to achieve "equal rights under law"

is in and of itself a violation of the Fourteenth Amendment of the United States Constitution.


61.     Plaintiff alleges that the "self-evaluation" requirements under the federal ADA

regualtions promulgated by the DOJ to implement Part A of Title II (28 C.F.R. § 35.150) are

either woefully inadequate or not adopted by the Policymakers of the City. *See Lewis Tyler v.*

*City of Manhattan*, (10th Cir.).


62.     Plaintiff claims that "a conscious failure to make policy can itself be an actionable

policy. *See Glisson v. Indiana Dept. of Corrections*, 849 F.3d 372 (7th Cir. 2017)(en banc)

63.     Plaintiff states that in relation to "police encountering people with disabilities",

individuals with disabilities enduring unlawful actions from local public entities, including law

enforcement officers not in compliance with Title II of the ADA and Section 504, the

overwhelming majority of circuit courts to address this issue, including the Tenth Circuit, have

held or assumed without deciding that Title II applies to arrests or related law enforcement

conduct. *See Gohier v. Enright*, 186 F.3d 1216, 1221 (10th Cir. 1999); *Gray v. Cummings*, 917

F.3d 1, 16-17 (1st Cir. 2019); *Haberle v. Troxell*, 885 F.3d 171, 180 (3d Cir. 2018); *Seremeth v.*

*Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 339 (4th Cir. 2012); *King v. Hendricks*

*Cnty. Comm'rs*, 954 F.3d 981, 988-89 (7th Cir. 2020); *Roberts v. City of Omaha*, 723 F.3d 966,

973 (8th Cir. 2013); *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir.

2014), *rev'd in part on other grounds, cert. dismissed in part by* 575 U.S. 600 (2015); *Bircoll v.*

*Miami-Dade Cnty.*, 480 F.3d 1072, 1085 (11th Cir. 2007). *But see Hainze v. Richards*, 207 F.3d

795, 801 (5th Cir. 2008) (the sole circuit court to hold that Title II applies to an officer's on-

thestreet responses to reported disturbances only after the officer has secured the scene and

ensured that there is no threat to human life).


64.     Moreover, A public entity violates the ADA where its officers or agents fail to

provide reasonable modifications to policies, practices, or procedures during an arrest when

such modifications are necessary to avoid disability discrimination, unless doing so would

fundamentally alter the nature of the service, program, or activity. *See* 28 C.F.R. 35.130(b)(7)

(i).

65.     Also, the reasonable modification obligation may include making changes to the
usual ways of doing things to accommodate an arrestee's disability.

66.     Likewise, Courts have repeatedly and properly held that a public entity's
obligation to make reasonable modifications is triggered when the entity knows that someone
has a disability and needs a modification, including when the need for a modification is
obvious, regardless of whether a modification is requested. *See, e.g., Greer v. Richardson
Indep. Sch. Dist.*, 472 F. App'x 287, 296 (5th Cir. 2012) (holding that a "failure to expressly
'request' an accommodation is not fatal to an ADA claim where the defendant otherwise had
knowledge of the individual's disability and needs but took no action"); *Duvall v. Cnty. of
Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) ("When the plaintiff has alerted the public entity to
his need for accommodation (or where the need for accommodation is obvious . . .), the public
entity is on notice that an accommodation is required. . . .").

67.     These standards apply equally to law enforcement entities. In *Robertson v. Las
Animas County Sheriff's Department*, the Tenth Circuit reversed an award of summary
judgment to a detention facility because there were questions of material fact about the
facility's knowledge of plaintiff's hearing disability and need for accommodations. 500 F.3d
1185, 1196-98 (10th Cir. 2007). As the Tenth Circuit explained, "a public entity is on notice
that an individual needs an accommodation when it knows that an individual requires one,
either because that need is obvious or because the individuals request an accommodation." Id.
At 1197-98.

68.     Importantly, and particularly in the case of a child with a disability, a request for modifications need not come only from the child. *See Robertson*, 500 F.3d at 1196 (holding that an entity knows about a disability when it "is obvious or because the individual (or someone else) has informed the entity of the disability"). Especially if the child's disability impacts their ability to communicate, law enforcement entities cannot use the child's failure to make a specific request to avoid liability. Instead, the need could be obvious or the request could be made by a parent or another adult who knows the child and how the child's disability affects them, such as school staff.

### C.     A Public Entity Can Be Liable for Damages Under Title II of the ADA for Disability Discrimination by a Municipal Officer During an Arrest

69.     As relevant here, it was reported to LPD that Plaintiff had moved in with his uncle on NW Euclid Ave. in the City after running away from Mr. Triston Wright's home in July of 2021. Thereafter, as a passenger in a vehicle, Plaintiff was racially profiled by LPD on his way home to his uncle's house. LPD forced the driver to pull over. Then an officer purposely hung up Plaintiff's cell phone while speaking to his uncle. Plaintiff attempted to explained to the officer that he was going to his uncle's house on the same street yards away. The LPD officer did not care to listen as he informed Plaintiff that he "fit the description" and was pulled out of the vehicle and illegally handcuffed and searched. Then without probable cause or any reasonable articulable suspicion of criminal activity and/or that Plaintiff is armed or dangerous, the LPD officer continued to illegally search Plaintiff for weapons by putting his hands into my Plaintiff's pockets while being detained. As a result, Plaintiff and his friend felt

devalued and experienced humiliation as "expressive harms" were committed by the officers of the LPD. After the "racially expressive subordination" ended by the officers, Plaintiff and his friend were free to leave with no charges issued. In conclusion, LPD officers violated Plaintiff's Fourth Amendment rights.

70.　　　Similarly, on Dec. 29, 2022, an allegedly pretextual traffic stop was made by LPD officers on SW 49th Street and West Gore Boulevard. The officers notified the male occupants of the vehicle, who were all African-Americans, that their headlight was out. The females were not subject to any citations or fines. Instead of ending the friendly stop with only the headlight warning, LPD officers prolonged the traffic stop by raising questions without any reasonable articulable suspicion of criminal activity or that they were armed and dangerous. To use nothing more than stereotypes to question teens about weapons and drugs, detain them longer than necessary to complete the purpose of the stop, and fail to obtain a warrant before searching their vehicle is a violation of their Fourth Amendment rights. The teens suffered "expressive harms" from the actions of the officers.

71.　　　On Friday, May 12, 2023, Plaintiff's father, A. Wilson, attended an "official interview" that was actuated by DEFENDANT Deputy Director of Emergency Communications RICHARD FRANZ regarding unconstitutional policing by the Lawton Police Department (LPD). Mr. A. Wilson informed Mr. FRANZ of mental diagnosis and Plaintiff's marijuana diagnosis from his primary physician and LPD's Fourth Amendment violations of the U.S. Constitution committed against Plaintiff, and three of his teenage friends with one

being a minor, as Mr. A. Wilson disputed the LPD officers' actions and omissions during a

routine traffic stop in the City of Lawton on December 29, 2022. These "pattern and practice"

violations of the Fourth Amendment by LPD were initiated by Officers NICHOLAS FLORES,

PATRICK BELLAMY, and BRANDON BECKER.  Plaintiff's father followed up Mr.

FRANZ'S report with a 5-page complaint to DEFENDANT JOHN RATLIFF entitled

LAWTON POLICE DEPARTMENT UNCONSTITUTIONAL POLICING on 6/12/2023.


72.      In conclusion, the City, LPD, and Mr. FRANZ unlawfully discriminates against

individuals with disabilities during stops. Low-level stops like these Plaintiff have experienced

at the hands of LPD are degrading and diminishes trust in law enforcement. These stops have

resulted in physical and psychological effects, and legal consequences. These harms of multiple

stops are particularly acute for Plaintiff who experience repeated interactions with LPD and

understand that he is being stopped most times because of his race and physical appearance that

LPD officers have described as "suspicious behavior". Plaintiff requests reviews by the DOJ

that will show LPD disproportionately patrol, stop, and search people of different socio-

economic status in the City. Plus, LPD employs different enforcement strategies in

neighborhoods with different class distinctions and racial compositions. LPD discriminates

during stops when deciding who to search. These practices undermine community trust and

violate federal law. Further, DOJ investigations will show that the City and LPD violate the

Americans with Disabilities Act (ADA) by discriminating against people with behavioral health

disabilities when providing emergency response services. The ADA prohibits discrimination

against people with disabilities, including by excluding them from participation in or denying

them the benefits of city services, programs, and activities; 42 U.S.C. § 12132; *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998). People with behavioral health disabilities must be able "to participant in or benefit from" the City's services, programs, and activities to an extent "equal to that afforded others" and that is equally "effective in affording equal opportunity to obtain the same result." 28 C.F.R. § 35.130(b)(1)(ii), (iii). The City must make "reasonable modifications" to policies, practices, or procedures, if necessary to avoid discrimination against people with disabilities; 28 C.F.R. § 35.130(b)(7); *see also* Title II Technical Assistance Manual § II-3.6100.

73.     Lastly, LPD's accountability system is fundamentally flawed. On Dec. 11-12, 2023, Defendant JOHN RATLIFF and LPD Captin, ULYSSES HENDERSON invited Plaintiff's father, Mr. A. Wilson, to attend and address their newly established Citizen Police Advisory Committee (CPAC). Plaintiff and his father allege that LPD consistently fails at its core purpose: to find, address, and prevent officer misconduct. Instead of a clear, straightforward accountability system, LPD's system is an opaque maze, with multiple dead ends where meritorious complaints are dismissed without proper investigation and often for no discernible reason. Significant allegations in complaints are mischaracterized or ignored. It seems that officers who commit serious misconduct are diverted to coaching or retraining, and sometimes, the coaching or retraining never happens. If LPD does investigate a complaint, usually by an understaffed internal affairs (IA) department that consists of one to two officers, Cpt. MARK MASON and Sgt. KENNETH DIXON, obvious misconduct is often overlooked or excused.

74.     On or about November 27, 2023, Defendant JOHN RATLIFF emailed Plaintiffs

father regarding the IA investigation by Defendant RICHARD FRANZ. Disagreement arose on

the investigation outcome. Mr. RATLIFF stated, "The law does not impose an affirmative

obligation on police officers to offer a reasonable accommodation without knowing an

individual is disabled." On Dec. 1, 2023, a 7-page email response from Plaintiff and his father

countered both Mr. FRANZ and Mr. RATLIFF's perspectives.

### COUNT I: TITLE II VIOLATIONS: 42 U.S.C. §§ 12131–12134; 504 OF THE REHABILITATION ACT OF 1973: 29 U.S.C. § 794
*Rashawn Wilson v. City of Lawton*

75.     Plaintiff incorporates all allegations set forth above as if fully set forth herein.

76.     The City of Lawton accepts federal financial assistance from the United States.

a) The Americans with Disabilities Act (ADA) is a federal civil rights law that

provides protections against discrimination based on disability.

b) Defendant have not complied with their obligation under title II of the ADA.

c) Defendants made a "conscious decision" to not adopt title II administrative

regulations to ensure individuals with disabilities are treated fairly.

d) Defendants failed to provide "reasonable accommodations" and "readily

accessible" auxiliary aids to Plaintiff.

77.     Plaintiff is a qualified individual with a disability.

a) Plaintiff is diagnosed with Post Traumatic Stress Disorder (PTSD) and

Attention Deficit Hyperactivity Disorder (ADHD) that affects his major bodily

function such as his neurological system that includes, but not limited to: physical

or mental impairments, visual impairments, emotional disorders.

b) The diagnosis of PTSD and ADHD affects Plaintiff's major life activities that include, but are not limited to: performing manual tasks, seeing, sleeping, learning, reading, concentrating, thinking, communicating, working, and interacting with others

78.     Plaintiff, by the reason of his disability, was denied on December 29, 2022, "meaningful access" and "full participation" in the benefits of programs, services, and activities provided by a public entity (City of Lawton and LPD).

a) Plaintiff was confused, did not understand, and denied reasonable accommodations/modifications to aid his disabilities as a back seat passenger during a traffic-stop.

b) As a result, Plaintiff was denied constitutional rights, assessed fines and municipal court fees and suffered emotional distress, pain and suffering as he could not afford to pay as he relied on his grandmother to assist him.

c) Defendant was "deliberately indifferent" to Plaintiff's disability needs and acted with "reckless disregard" to rectify it's unwritten ADA policy

d) Defendant knew or should have known it was reasonably foreseeable that inactions and acts contrary to Title II would cause severe emotional distress.

e) Defendant did not exercise reasonable care as the City's conduct was outrageous, indecent, atrocious, odious, uncivilized, or intolerable.

f) Thereby, Plaintiff suffered severe emotional distress as a proximate result.

79.     Plaintiff seeks damages, including for the extent of Plaintiff's injuries, pain and suffering, emotional distress, as well as all available damages available under the law.

**WHEREFORE**, Plaintiff moves this Honorable Court to enter an Order of Judgment against Defendant City of Lawton, Michael Cleghorn and Stan Booker, pursuant to 42 U.S.C. § 1983 and 42 U.S.C. §§ 12131-34, in an amount in excess of One Million Dollars (1,000,000.00) including interest, delay damages, costs of suit, general and specific damages, including compensatory and actual damages, punitive and exemplary damages as provided by law, attorneys' fees, and to grant such other and further relief as the Court may deem reasonable and just under the circumstances.

<u>**COUNT II: 42 U.S.C. § 1983: DEPRIVATION OF RIGHTS**</u>
*Rashawn Wilson v. City of Lawton*

80.     Plaintiff incorporates all allegations set forth above as if fully set forth herein.

81.     The Defendant accepts federal financial assistance from the United States.

a) Plaintiff identified and documented deficiencies in City's policy or custom under "Code 13-1-101" to access Title II public accommodations to the City programs, services, and activities.

b) Defendant treating minorities with disabilities differently under the Fourteenth Amendment is a matter of public concern

c) Defendant's "conscious failure" to adopt Title II administrative regulations reflects a "reckless disregard" for a high risk that the City would deny reasonable accommodations in violation of Plaintiff's federally protected rights.

d) Defendant's willful inactions and omissions to rectify Title II and the ADA process resulted in violations in federally protected rights.

e) Plaintiff was deprived of fundamental rights, privileges, or immunities secured

by the Constitution or laws of the United States, such as title II of the ADA.

Section 1983 "does not create a federal right or benefit; it simply provides a

mechanism for enforcing a right or benefit established elsewhere." (*Oklahoma

City v. Tuttle*, 471 U.S. 808, 816 (1985)).

82.     Defendant engages in "pattern and practice" violations of federal rights.

a) Plaintiff gave Defendant actual or constructive notice that the City's actions or

inactions would violate federal civil rights under the ADA.

b) Plaintiff warned Defendant that other departments throughout the City would

result in discrimination against minorities and individuals with disabilities.

c) Defendants' willful inactions and omissions did not rectify the discrimination

against minorities and individuals with disabilities.

d) Thereby, Plaintiff's civil rights were "repeatedly" violated by Defendants.

83.     Defendant improperly conducts internal affairs investigations of the ADA.

a) Plaintiff requested internal affairs investigations about ADA violations.

b) Plaintiff's investigative requests were improperly invested by LPD as there

was no wrongdoing found by Defendants.

c) Defendants' willful inactions and omissions did not rectify the discrimination

and the improper IA investigations of violations against people with disabilities.

d)  Therefore, Plaintiff was denied and deprived of fair and impartial

investigations of federal civil rights violations corroborated by Defendants.

e) Accordingly, Defendant was deliberately indifferent and acted with reckless disregard toward individuals with disabilities.

f) Defendant knew or should have known it was reasonably foreseeable that their acts would cause severe emotional distress.

g) Defendant did not exercise reasonable care as the Policymakers' conduct was outrageous, indecent, atrocious, odious, uncivilized, or intolerable.

h) Thereby, Plaintiff suffered severe emotional distress as a proximate result.

84. Plaintiff seeks damages, including for the extent of Plaintiff's injuries, pain and suffering, emotional distress, as well as all available damages available under the law.

**WHEREFORE**, Plaintiff moves this Honorable Court to enter an Order of Judgment against Defendant City of Lawton, Michael Cleghorn, Kelea L. Fisher, and Michael Jones pursuant to 42 U.S.C. § 1983 and 42 U.S.C. §§ 12131-34, in an amount in excess of One Million Dollars (1,000,000.00) including interest, delay damages, costs of suit, general and specific damages, including compensatory and actual damages, punitive and exemplary damages as provided by law, attorneys' fees, and to grant such other and further relief as the Court may deem reasonable and just under the circumstances.


Respectfully submitted,

By /s/ Rashawn Wilson, pro se
210 NW Cherry Ave.
Cache, Oklahoma. 73527
Phone: (803) 807-0612
Email: Andrelwilson@outlook.com